UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| Thomas Marshall, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-cv-00191-PB-AJ |
| | ) | |
| United States of America, Federal Bureau of | ) | |
| Investigation, BATF, and Merrick Garland, in | ) | |
| his official capacity as Attorney General, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Plaintiff Thomas Marshall is a recidivist offender of Massachusetts' criminal laws prohibiting driving under the influence ("DUI"). As a result of DUI convictions in 1997 and 2005, Marshall is subject to disarmament by the legislature. *See* 18 U.S.C. § 922(g)(1). Contrary to his claim in this action, that result accords with the "principles" underlying the scope of the right to bear arms codified in the Second Amendment, as demonstrated in this nation's "history and tradition." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S 1, 26-31 (2022); *United States v. Rahimi*, 602 U.S. ---, 144 S. Ct. 1889, 1898 (2024). Both the Founders and their English predecessors disarmed groups whose possession of firearms they deemed dangerous, whether to others' physical safety or the social order. Marshall's disarmament falls squarely within this tradition.

First, *Bruen* and *Rahimi* do not disturb First Circuit precedent holding the statute constitutional as applied to person with convictions for crimes that threaten others' physical safety. To the extent that this Court finds that First Circuit precedent does not dispose of Marshall's Complaint outright, however, § 922(g)(1) comports with our national tradition of

1

firearm regulation.      Even if they did, the history of firearm regulation shows that in England, colonial America, and at the Founding, legislatures were understood to have the authority to categorically disarm groups believed to pose a danger to physical safety or the social order. Section 922(g)(1)'s judgment that offenses punishable by more than a year are seriousness enough to lead to disarmament is consistent with this principle, and no individualized, offense-by-offense analysis is required. And drunk driving, of which Marshall has been convicted twice, is a serious offense that poses a significant danger to others' physical safety. Thus, § 922(g)(1) is consistent with the Second Amendment as applied to Marshall, and he has failed to state a claim on which relief can be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Marshall has two convictions, dating from 1997 and 2005, for driving while under the influence of alcohol in violation of Massachusetts law, which proscribes a person from "operat[ing] a motor vehicle with a percentage, by weight, of alcohol in their blood of eight one-hundredths or greater, or while under the influence of intoxicating liquor."[1]  *See* Mass. Gen. L. ch. 90, § 24. A first offense under this statute "shall be punished by a fine . . . or by imprisonment for not more than two and one-half years, or both such fine and imprisonment." *Id.* A second offense increases the possible term of imprisonment to "not less than sixty days nor more than two and one-half years." *Id.* Massachusetts law labels both these offenses as misdemeanors. *See* Mass. Gen. L. ch. 274, § 1 (defining a felony as "a crime punishable by death or imprisonment in the state prison" and all other crimes as misdemeanors); ch. 90, § 24(1)(a)(1)

---

[1] In 1997, the statute did not reference a specific blood alcohol content, defining the offense as driving "while under the influence of intoxicating liquor." Mass. Gen. L. ch. 90, § 24 (1997). The required blood alcohol content had been added to the statute by 2005. *See*  Mass. Gen. L. ch. 90, § 24 (2005). Given that Plaintiff pleaded guilty to both offenses, the government does not consider this difference material to the analysis here.

(first and second offenses punishable by "imprisonment," compared to third and subsequent offenses punishable by "imprisonment in the state prison").

After Marshall and his family moved from Massachusetts to New Hampshire in October 2023, he applied to buy a handgun for self-defense and defense of his family. Compl., Docket Number ("DN") 1, ¶ 30. However, on February 23, 2024, the New Hampshire State Police Permits and Licensing Unit denied his purchase, on the basis that his Massachusetts convictions disqualified him from possessing a firearm under 18 U.S.C. § 922(g)(1). *Id.,* ¶¶ 30-31; Ex. D to Compl., DN 1-4.

Marshall now alleges that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him. DN 1. He asks this Court to declare that the statute violates his Second Amendment rights and to enjoin any enforcement of the statute, its regulations, and related laws, policies, and procedures against him that would burden his exercise of those rights. *Id.* at 15-16.

LEGAL BACKGROUND

I.     Section 922(g)(1).

Section 922(g)(1) generally prohibits the possession of firearms by any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." However, as pertinent here, a conviction is not disqualifying for purposes of Section 922(g)(1) if it was for a "State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less," or "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored."[2] 18 U.S.C. § 921(a)(20).

---

[2] Also excluded as disqualifying offenses are "Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." Id. § 921(a)(20)(A).

Until 1992, Congress also allowed an individual to obtain relief from § 922(g)(1)'s bar to possessing a firearm by demonstrating to the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c); *see also* 27 C.F.R. § 478.144 (delegating authority to the Director of ATF). But since 1992, Congress has effectively suspended that provision by prohibiting the use of federal funds to process applications for relief. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007).

However, 18 U.S.C. § 921(a)(20) provides that "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored [by the jurisdiction where the proceedings were held] shall not be considered a conviction for the purposes of this chapter," unless the pardon or other process "expressly provides that the person may not ship, transport, possess, or receive firearms."[3]

II.   <u>Second Amendment Jurisprudence</u>

A.   <u>*Heller*</u> and First Circuit Progeny.

The Second Amendment to the Constitution provides: "A well regulated Militia, being

---

[3] Marshall claims that there is no mechanism "available in New Hampshire or under federal law" for him to regain his right to bear firearms. DN 1, ¶57.  However, because what constitutes a conviction of a disqualifying crime is "determined in accordance with the law of the jurisdiction in which the proceedings were held,"18 U.S.C. § 921(a)(20), any petition for relief from his disability would go to Massachusetts, the state of conviction, not New Hampshire.  *See Smith v. United States*, 63 F.4th 677, 680 (8th Cir. 2023) (restoration of plaintiff's right to possess firearms in Minnesota did not relieve him of his prohibition under federal law, because he had convictions in Iowa to which his restoration of rights in Minnesota did not apply); *see also Beecham v. United States*, 511 U.S. 368, 371-73 (1994) (what should be "considered a conviction" for the purposes of § 922(g)(1) is "governed by the law of the convicting jurisdiction," regardless of whether that jurisdiction provides the option to restore one's civil rights). Marshall does not allege that he has petitioned the governor of Massachusetts for pardons for his convictions.  *See* Mass. Const. Pt. 2, C. 2, § 1, art. VIII.

necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees the right of "law-abiding, responsible citizens" to keep and bear arms for self-defense, invalidating state laws that effectively banned handgun possession in the home and required firearms within homes to be kept inoperable. 554 U.S. 570, 635 (2008).

In reaching this conclusion, *Heller* cautioned that "[l]ike most rights," the "right secured by the Second Amendment is not unlimited." *Id.* at 626. Rather, it concluded that historical sources demonstrated that the Second Amendment protects, specifically, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. *Heller* further stated that "nothing" in its holding "should be taken to cast doubt on" the "longstanding" prohibition "on the possession of firearms by felons," which it described as "presumptively lawful." *Id.*, at 626, 627 n. 26.

When the Supreme Court subsequently extended *Heller* to state and local governments, it "repeat[ed] [its] assurances" that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *Heller*, 554 U.S. at 626-27).

Following *Heller*, the First Circuit addressed the constitutionality of 18 U.S.C. § 922(x)(2)(A), which generally prohibits juveniles from possessing handguns, as applied to the defendant in *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009). The First Circuit noted that *Heller* "left intact" laws "prohibiting the possession of firearms by felons," as well as "others similarly rooted in history." *Rene E.*, 583 F.3d at 12. Following the framework of *Heller*, as pertinent here, the Court drew on historical sources to hold that Founders would have regarded

the prohibition as consistent with the Second Amendment. *Id.* at 15-16 ("[T]he right to keep

arms in the founding period did not extend to juveniles."). In reaching this conclusion, the Court

noted both a "longstanding practice of prohibiting certain classes of individuals from possessing

firearms – those whose possession poses a particular danger to the public," and the principle that

the right to bear arms "was limited to those members of the polity who were deemed capable of

exercising it in a virtuous manner." *Id.* at 15 (but also acknowledging historical debate over "the

extent" to which states used their authority to regulate gun possession at the founding in

accordance with the latter principle).

      In 2011, the First Circuit addressed a facial challenge to the constitutionality of 18 U.S.C.

§ 922(g)(9), which prohibits gun possession by individuals convicted of a misdemeanor crime of

domestic violence. *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011). The *Booker* court

recognized that the "full significance" of *Heller*'s "presumptively lawful" passage is "far from

self-evident." *Id.* at 23. It did, however, elicit two "important points" from this language: first,

"the Second Amendment permits categorical regulation of gun possession by classes of persons

– e.g., felons" and does not require restrictions to be "imposed only on an individualized, case-

by-case basis." *Id.* Second, *Heller* did not eliminate the legislature's role in determining

appropriate categorical exclusions, because those valid exclusions "need not mirror limits on the

books in 1791." *Id.* at 23-24 (cleaned up). The Court acknowledged that modern felon-in-

possession laws have evolved over time to extend to non-violent offenders, and that laws

prohibiting those convicted of a violent crime are "arguably more consistent with the historical

regulation of firearms." *Id.* at 24. Regardless, the Court found that § 922(g)(9) is consistent with

the "presumptively lawful" bans prohibiting felons from possessing firearms, particularly as it

covers "only those with a record of violent crime."[4] *Id.* at 24-25 (citation omitted).

The First Circuit addressed the constitutionality of § 922(g)(1) itself in *United States v. Torres- Rosario*, 658 F.3d 110 (1st Cir. 2011). There, the defendant claimed that under *Heller*, the statute was unconstitutional both facially and as applied to him, because he lacked a prior conviction for a violent felony. *Id.* at 113. The *Torres-Rosario* Court observed that all circuits that have considered the constitutionality of the statute "post *Heller* have rejected blanket challenges to felon in possession laws," and noted the "well-established" principle that "felons are more likely to commit violent crimes than are other law-abiding citizens." *Id.* The Court also recognized that *Heller*'s "presumptively lawful" language, although "at most . . . reserv[ing] the possibility of yet to be developed qualifications," suggested the Supreme Court "*may* be open to claims" that certain non-violent felonies "cannot be the basis for applying a categorical ban." *Id.* (emphasis added). Assuming for the sake of argument that the Supreme Court might consider "some felonies so tame and technical as to be insufficient to justify the ban," the Court found that the "notorious" link between drug dealing and violence meant that the defendant's two serious drug convictions were "not likely to be among them." *Id.* The Court did not discuss further how to distinguish "tame and technical" felonies from crimes "indicat[ing] potential violence." *Id.* It did, however, note that as-applied challenges offering "highly fact-specific objections," when "applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency, and fair warning." *Id.*

---

[4] The First Circuit also held that to survive constitutional muster, a categorical ban on gun ownership by a particular class of individuals must be supported by a strong showing that there is a substantial relationship between the restriction and an important government interest, and that the government had easily made this strong showing. *Id.* at 25 (internal quotation marks and citation omitted). While this portion of the analysis does not survive *Bruen*'s rejection of the means-end standard, see below, *Booker*'s approval of class-based exclusions remains good law.

B.      _Bruen_ and First Circuit Progeny.

A decade after _Booker_ and _Torres-Rosario_, the Supreme Court decided _Bruen_ to "ma[k]e the constitutional standard endorsed in _Heller_ more explicit." 597 U.S. at 31. The _Bruen_ Court rejected the "two-step framework" that had developed since _Heller_, which combined "history with means-end scrutiny," as requiring "one step too many." _Id._ at 18-19. While the reliance on history was consistent with _Heller_, the means-end scrutiny was not. _Id._

Instead, _Bruen_ established a different two-step test for assessing whether a government regulation infringes on the Second Amendment. The first is to determine whether the "Second Amendment's plain text covers" the individual's conduct. _Id._ at 24. If the government demonstrates that a law regulates activity "falling outside the scope of the right as originally understood," the activity is not constitutionally protected. _Id._ at 18. However, if the conduct falls within the Second Amendment's original scope (or if the evidence on this point is inconclusive), the government must "affirmatively prove its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." _Id._ at 19.

To determine whether the government has met this burden, courts should consider "whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." _Id._ at 27 (quoting _Heller_, 554 U.S. at 631). A tradition of regulation does not require courts to find a "historical _twin_" to the challenged legislation; rather, courts should employ analogical reasoning to determine whether the government has identified "a well-established and representative historical _analogue_." _Id._ at 30 (emphases in original). Identifying a proper analogue for a modern regulation requires determining whether the two regulations are "relevantly similar," including "how and why the regulations burden a law-abiding citizen's right to armed self-defense." _Id._ at 29 (internal quotation marks omitted). Self-

defense lies at the core of the Second Amendment, so "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are *central* considerations." *Id.* (emphasis in original) (internal quotation marks omitted).

The First Circuit applied *Bruen*'s test in *Ocean State Tactical, LLC v. Rhode Island*, in which gun owners and a firearms dealer challenged the constitutionality of Rhode Island's 2022 ban on magazines or feeding devices capable of holding more than ten rounds of ammunition and sought a preliminary injunction on its enforcement. 95 F.4th 38, 41 (1st Cir. 2024). Assuming without deciding that these large capacity magazines were "arms" within the scope of the Second Amendment, the Court rejected the plaintiffs' claim that Rhode Island's was inconsistent with tradition because some eighteenth- and nineteenth-century firearms could fire more than ten rounds without reloading and remained unregulated. *Id.* at 44. The First Circuit emphasized that the modern regulation "'implicat[ed] unprecedented societal concerns,'" because modern semi-automatic firearms are "substantially more lethal" than the earlier firearms, and the mass shootings facilitated by such firearms were unknown to the Founders. *Id.* (quoting *Bruen*, 597 U.S. at 27).

But the lack of "directly on-point tradition on which to rely" did not end the Court's inquiry; employing "analogical reasoning" to find a "relevantly similar" historical analogue, it looked to "'how and why'" other historical regulations "burden[ed] a law-abiding citizen's right to armed self-defense." *id.* at 44-45 (quoting *Bruen*, 597 U.S. at 29). Evidence that civilians virtually never fire more than ten rounds in self-defense demonstrated that banning the large capacity magazines "impose[d] no meaningful burden on the ability of Rhode Island's residents to defend themselves." *Id.* at 45. The Court also considered that the historical tradition of firearm

regulation included early twentieth-century bans on sawed-off shotguns (used by "Prohibition-era gangsters like Bonnie Parker and Clyde Barrow," *id.* at 47), nineteenth-century bans on Bowie knives (designed "for fighting" and implicated in a "nationwide surge of homicides"), and limitations on possession of machine guns and weapons appropriate to the military – all "respond[ing] to a growing societal concern about violent crime by severely restricting the weapons favored by its perpetrators, even though those same weapons could conceivably be used for self-defense." *Id.* at 48. Rejecting the plaintiffs' argument that these nineteenth- and twentieth-century laws "come too late to provide insight," the Court agreed that founding-era precedent was of "primary importance" for identifying a tradition of analogous regulation, but pointed to *Heller*'s reliance on "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century," and *Bruen*'s acknowledgment that "late-19th-century evidence and 20th-century historical evidence may have probative value if it does not contradict[ ] earlier evidence." *Id.* at 51. The First Circuit also identified founding-era laws that limited the amount of gunpowder that one person could possess or store in one container, intended to mitigate "the risks posed by the aggregation of large quantities of gunpowder, which could kill many people at once if ignited. *Id.* at 49. Considering all the historical evidence, the Court concluded that the plaintiffs had not shown the likelihood of success on the merits required to support a preliminary injunction.

  C.  <u>*Rahimi.*</u>

  Although Marshall's Complaint does not address it, nine days before he filed his Complaint on June 30, 2024, the Supreme Court issued *Rahimi*, which applied *Bruen* to 18 U.S.C. § 922(g)(8), the federal prohibition on possession of a firearm while being subject to a domestic violence restraining order. 144 S.Ct. 1889 (2024). Noting that "some courts have

misunderstood the methodology of our recent Second Amendment cases," *Rahimi* explained that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition" and ascertaining "whether the new law is relevantly similar to laws that our tradition is understood to permit." *Id.* at 1898 (emphasis added). The Supreme Court further emphasized that a challenged law must "comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin;'" even when a challenged regulation "does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.' " *Id.* (quoting *Bruen*, 597 U.S. at 30).

On the merits, *Rahimi* identified two  appropriate founding-era analogues: first, surety laws allowed the authorities to require "individuals suspected of future misbehavior to post a bond," which would be forfeit if the person subsequently broke the peace; as the Supreme Court noted, these laws came to encompass requiring a bond from people who went about armed, including with a pistol. *Id.* at 1900.  Second, the affray laws allowed for the disarmament of those who went about armed, "to terrify the good people of the land." *Id.* at 1901. Because "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others," the Supreme Court had "no trouble concluding that Section 922(g)(8) survives Rahimi's challenge." 144 S. Ct. at 1902.

Since *Rahimi*, several circuit courts of appeals have upheld § 922(g)(1) against constitutional challenges. *See, e.g.*, *United States v. Jackson*, 110 F.4th 1120, 1125-26 (8th Cir. 2024) (finding § 922(g)(1) constitutional as applied to defendant because "there is no need for felony-by-felony litigation" on the issue); *United States v. Whitaker*, No. 24-10693, 2024 WL 3812277, at *2-3 (11th Cir. Aug. 14, 2024) (finding that *Rahimi* did not disturb circuit precedent

holding § 922(g)(1) constitutional under *Heller* and *Bruen*); *United States v. Williams*, 113 F.4th 637, 648, 662 (6th Cir. 2024) (finding that *Bruen* and *Rahimi* did invalidate circuit precedent, but finding anew that history and tradition supported § 922(g)(1)'s constitutionality as applied to groups of people believed to be dangerous); *United States v. Diaz*, No. 23-50452, 2024 WL 4223684, at *9 (5th Cir. Sept. 18, 2024) (finding § 922(g)(1) constitutional as applied to defendant with history of theft).. *Rahimi* also did not disturb the consensus that §  922(g)(1) is not plainly unconstitutional. *See United States v. Hildreth*, 108 F.4th 912, 919 (5th Cir. 2024); *United States v. Rodriguez*, No. 23-2730, 2024 WL 3518307, at *2 (3d Cir. July 24, 2024).

      While the First Circuit has not squarely addressed the merits of an as-applied challenge since *Rahimi*, in *United States v. Langston*, it found no plain error in the district court's failure to require the government to provide evidence that § 922(g)(1) conforms to the historical tradition of firearm regulation in a criminal prosecution under that statute. 110 F.4th 408 (1st Cir. 2024). *Langston* held that "rather than compelling the conclusion that § 922(g)(1) is unconstitutional, the Supreme Court's Second Amendment cases consistently reiterate, albeit in dicta, the presumptive lawfulness of the felon-in-possession statute." *Id.* at 419. Further, the First Circuit found that to the extent that the defendant raised a challenge to § 922(g)(1) "as applied to all individuals with nonviolent underlying convictions," he failed under plain-error review because "it would not have been clear and obvious to the district court that Langston fell within this category of individuals, given his prior conviction for heroin trafficking." *Id.* at 420. The *Langston* Court acknowledged that the Supreme Court has not yet resolved the appellant's claim; *Rahimi*'s holding, that the Second Amendment allows a person whom a court has found poses a credible threat to the physical safety of another to be temporarily disarmed, is not dispositive of a challenge to § 922(g)(1). *Id.* The Court nonetheless again noted, in ruling against the appellant,

that "the Supreme Court has stated repeatedly over sixteen years . . . that felon-in-possession laws are presumptively lawful." *Id.*

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a district court should dismiss a complaint when the underlying allegations fail to state a "plausible entitlement to relief." *Alvarado Aguilera v. Negron*, 509 F.3d 50, 53 (1st Cir. 2007). In evaluating plausibility, this Court conducts a "two-step" inquiry. *Garcia-Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013). Initially, "the court must distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Id.* (cleaned up). Next, the court must determine whether the factual allegations suffice to support "the reasonable inference that the defendant is liable for the misconduct alleged." *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). If the well-pleaded factual allegations, accepted as true, nonetheless fail to state a claim that is both "actionable as a matter of law and 'plausible on its face,'" the Court should dismiss the complaint. *Bartlett v. Dep't of Treasury*, 922 F.Supp.2d 156, 158 (D. Mass. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

A challenge to a statute's constitutionality may be facial or as applied. A facial challenge requires a plaintiff to "establish that no set of circumstances exists under which the Act would be valid," *Rahimi*, 144 S. Ct. at 1898. Here, in as-applied challenge, the Plaintiff must prove only that § 922(g)(1) fails muster when applied to the facts of his case. This distinction between facial and as-applied challenges "goes to the breadth of the remedy employed by the Court." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). "[I]t does not speak at all to the substantive rule of law necessary to establish a constitutional violation," and therefore the same

13

substantive constitutional analysis applies. *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019). *See also Gross v. United States*, 771 F.3d 10, 14-15 (D.C. Cir. 2014) ("[T]he substantive rule of law is the same for both challenges.").

ARGUMENT

I.      First Circuit Precedent Forecloses Marshall's Argument.

As a preliminary matter, the government notes that Marshall grounds his complaint firmly in Third Circuit jurisprudence. But not only does the case law that Marshall cites not bind this Court; neither, at this juncture, does it bind the Third Circuit. Marshall's primary support is *Binderup v. Attorney General*, which found § 922(g)(1) unconstitutional as applied to two plaintiffs disqualified from firearm possession by convictions for state misdemeanors punishable by more than two years – one for corrupting a minor, and one for unlawfully carrying handgun without a license. 836 F.3d 336 (3d Cir. 2016).  However, while *Binderup* considered the national history of firearms regulation in concluding that "persons who have committed serious crimes forfeit the right to possess firearms," it ultimately relied on the means-end analysis that *Bruen* later rejected to find that the government had failed to survive heightened scrutiny review. *Id.* at 349, 353. Accordingly, it no longer governs in the Third Circuit. *See Range v. Attorney General*, 69 F.4th 96, 101 (3d Cir. 2023) (recognizing *Binderup*'s abrogation under *Bruen*).

Marshall's second support is *Range v. Attorney General*, which upheld an as-applied challenge to § 922(g)(1) brought by a plaintiff disqualified by a state conviction for making a false statement on an application for food stamps. *Id.* at 97. The offense was a misdemeanor, but punishable by up to five years' imprisonment. *Id.* The Third Circuit concluded that the government failed to show a historical tradition of permanently disarming persons in the plaintiff's circumstances. However, after *Rahimi*, the Supreme Court granted certiorari, vacated

the opinion, and remanded the case to the Third Circuit for further proceedings consistent with *Rahimi*.[5]  Accordingly, *Range* is of no avail to Marshall.[6]

The third leg of Marshall's argument is *Williams v. Garland*, an Eastern District of Pennsylvania district court order holding § 922(g)(1) unconstitutional as applied to a plaintiff who, like Marshall, was disqualified from possessing firearms by state convictions for DUI. Civil Action No. 17-cv-2641, 2023 WL 7646490, *4 (E.D. Pa. Nov. 14, 2023). But *Williams* reached that result by relying heavily on *Range*. *See id.* at *3 ("This Court finds that the narrow analysis in *Range* also applies to the Plaintiff here."). With *Range* vacated, *Williams* loses its primary authority.[7]

Even if *Range* and *Williams* were not in flux, their analyses suffer from the flaws in post-*Bruen* case law that the Supreme Court identified in *Rahimi* – treating the law as if it were "trapped in amber" and seeking a "historical twin" to the modern regulation rather than an analogue. *Rahimi*, 144 S.Ct. at 1897-1898.  Both reject the principle that the Founding-era governments disarmed groups they distrusted as "too broad" to support disarming.  *Range*, 69 F.4th at 105; *Williams*, 2023 WL 7646490, at *5.

Marshall's reluctance to cite to First Circuit Second Amendment jurisprudence is perhaps unsurprising given that the First Circuit has consistently held § 922(g)(1) to be constitutional. In *Torres-Rosario*, the First Circuit relied on *Heller* to find § 922(g)(1) constitutional in the context

---

[5] *Range* has been briefed and is scheduled for oral argument on October 9, 2024. *Range v. Attorney General*, Case No. 21-2835 (Third Circuit).
[6] Moreover, before *Range*, the Third Circuit had held that a defendant's "DUI conviction constitutes a serious crime, placing him within the class of persons historically excluded from Second Amendment protections." *Holloway v. Att'y Gen. United States*, 948 F.3d 164, 177 (3d Cir. 2020) abrogation recognized by *Range v. Attorney General*, 69 F.4th 96 (3rd Cir. 2023).
[7] *Williams* is currently on appeal to the Third Circuit. Case No. 24-1091. Briefs have been submitted and oral argument is scheduled for November 1, 2024.

of an as-applied challenge, and no subsequent First Circuit or Supreme Court case law disturbs

that conclusion. 658 F.3d at 113. *Bruen* repeated *Heller's* statement that bans prohibiting felons

from possessing firearms are presumptively lawful, on which the *Torres-Rosario* court had

relied. In fact, at least five justices indicated their explicit support for this conclusion. Justice

Kavanaugh, joined by Chief Justice Roberts, wrote a concurring opinion to "underscore" that

*Bruen* did not upset *Heller's* conclusion that the opinion should "not cast doubt on longstanding

prohibitions on the possession of firearms by felons." *Bruen*, 142 S. Ct. at 1261-62 (Kavanaugh,

J., concurring). And Justice Breyer, joined by Justices Kagan and Sotomayor, wrote that *Bruen*

"cast[s] no doubt on" *Heller*'s treatment of laws prohibiting firearms possessions by felons – a

statement that the majority let pass without challenge. *Id.* (Breyer, J., dissenting).

    *Rahimi* did nothing to undermine this precedent. In fact, as the First Circuit has

recognized, "the Supreme Court's majority opinion in *Rahimi*, joined by eight justices, once

again identified prohibitions on the possession of firearms by felons as 'presumptively lawful.'"

*United States v. Langston*, 110 F.4th 408, 420 (1st Cir. 2024) (quoting *Rahimi*, 144 S. Ct. at

1902). Rather, *Rahimi* offers a course correction to the strictest applications of *Bruen* by

emphasizing that a modern regulation must "comport with the principles underlying the Second

Amendment," but need not "precisely match" the "law trapped in amber" of its "historical

precursors." *Rahimi*, 144 S. Ct. at 1897-98; *see id.* at 1905 (rejecting the "rigid approach to the

historical inquiry" in the dissent's "strictest interpretation" of *Bruen*) (Sotomayor, J.,

concurring); 1925 (rejecting "narrower" applications of *Bruen* that require the government to

find a "founding-era relative of the challenged regulation – if not a twin, a cousin," in favor of

adopting "a wider lens" to "reveal a principle, not a mold") (Barrett, J., concurring); *see also*

*Williams*, 113 F.4th at 645 n.2 (*Rahimi* "clarified the level of generality at which courts compare

modern regulations with historical analogues"). Thus, while *Rahimi* has upended the Third Circuit case law on which Marshall relies, it does not disturb the precedent binding this Court.

Further, although First Circuit precedent does not squarely address an as-applied challenge brought by someone with Marshall's precise criminal history, the First Circuit has never squarely concluded that the Second Amendment requires allowing an as-applied challenge at all. The *Torres-Rosario* court assumed for the sake of argument that the appellant could bring an as-applied challenge, but warned about the "serious problems of administration, consistency, and fair warning" that as-applied challenges would entail. 658 F.3d at 113; *see United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), *cert. denied*, 562 U.S. 1303 (2011) ("That some categorical limits are proper is part of the original meaning" of the Second Amendment").

II.     § 922(g)(1) Is Constitutional as Applied to Plaintiff.

Even if the Court analyzes § 922(g)(1) under *Bruen* and *Rahimi*, Plaintiff's Complaint fails to state a claim. Because the Second Amendment applies only to law-abiding citizens, Marshall falls outside its protections. Should this Court disagree, however, history shows that legislatures have traditionally had the ability to disqualify classes of people from firearm possession based on the danger they posed, both to the physical safety of others and the peace of the body politic.  Disarming those who committed crimes considered serious enough to merit punishment by more than a year fits comfortably within that tradition. And although, for obvious reasons, we cannot look to the Founding era for a law against operating a motor vehicle while drunk, contemporary laws addressing the risks posed by operating firearms while drunk show that the Founders would have found it permissible to disarm someone in Marshall's position – who had shown himself as untrustworthy by failing to follow the law and a threat to others.

A.     § 922(g)(1) Regulates Activity Outside the Scope of the Second Amendment.

17

The Supreme Court has held that the Second Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 597 U.S. at 31-32, who are entitled to be "members of the political community," *Heller*, 554 U.S. at 580. Section 922(g)(1)'s status-based restriction on who can possess firearms reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment do not fit those criteria. *See Booker*, 644 F.3d at 25 n.17 ("We would question whether appellants, who manifestly are not 'law-abiding responsible citizens,' fall within this zone of interest.").

The Second Amendment's background illuminates the reasons for that limitation. The Founders codified the right to bear arms in large part because they regarded it as an important "safeguard against tyranny." *Heller*, 554 U.S. at 600. Justice Story, for instance, described the right to bear arms as the "palladium of the liberties of a republic" and explained that it "enable[s] the people to resist and triumph over" the "usurpation and arbitrary power of rulers." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1890, at 746 (1833). It makes sense that a right that was codified to enable the polity to "resist tyranny," *Heller*, 554 U.S. at 598, would be limited to the members of that polity.

Consistent with that understanding, persons who do not belong to the political community have historically been denied the right to bear arms. For example, the right to bear arms has historically been reserved to "citizens." *Heller*, 554 U.S. at 635; see id. at 581 ("Americans"). Noncitizens at the Founding lacked the "right to bear arms" – just as they lacked other "rights of members of the polity," such as the right to "vote, hold public office, or serve on juries." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 48 (1998). Even today, federal law disarms certain noncitizens—specifically, those who are unlawfully present in

the United States, those who have been admitted on nonimmigrant visas (with some exceptions), and those who have renounced U.S. citizenship. *See* 18 U.S.C. § 922(g)(5), (g)(7), (y).

Those who have committed serious crimes are likewise not among "the people" protected by the Second Amendment because they have forfeited their membership in the political community. *Cf. Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting) (tying *Heller*'s approval of felon disarmament to the understanding that certain individuals "are beyond the scope of the 'People' protected by the Second Amendment"). States have long denied felons the rights of members of the polity – the right to vote, *see* U.S. Const. amend. XIV, § 2; *Richardson v. Ramirez*, 418 U.S. 24, 41-56 (1974); the right to hold public office, *see Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve on juries, *see id.* And as a leading nineteenth-century scholar explained, "the felon" has "been almost universally excluded" from "the people in whom is vested the sovereignty of the State." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868)

Further, while "the people" refers to members of the political community throughout the Constitution, *see Heller*, 554 U.S. at 580, the scope of that community varies from provision to provision. For example, noncitizens are not among "the people" protected by the Second Amendment, *see id.* at 581; *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring in the judgment), but certain noncitizens are among "the people" protected by the Fourth Amendment, *see United States v. Verdugo-Urquidez*, 494 U.S. 259, 265, 271-73 (1990). And references in the Constitution to "the people" as a group involved in voting excludes felons who have forfeited (temporarily or permanently) their right to participate in the political process.

*See* U.S. Const. Art. I, § 2, Cl. 1. So too, felons disarmed under Section 922(g)(1) are not among "the people" entitled to keep and bear arms.

Ultimately, however, the Court need not decide this issue because legislatures may bar even those among "the people" from possessing firearms without running afoul of the Second Amendment.

B.   The Nation's Historical Tradition of Firearms Regulation Supports Disarming Groups Considered Untrustworthy.

Even if this Court concludes that the Second Amendment covers felon possession of firearms, under *Bruen*, § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 19. Beginning in England and lasting at least through the founding era, history establishes that legislatures may disarm those whose possession of firearms would be dangerous, that dangerousness encompassed threats to both to the physical safety of others and to the social order as untrustworthy adherents to the law, and that legislatures may make these determinations on a categorical basis.

To start, the Second Amendment "codified a right 'inherited from our English ancestors.'" *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 599). Therefore, "the [English] common law and . . . British institutions as they were when the instrument was framed and adopted" are probative of the Second Amendment's meaning. *Id.* at 39 (emphasis omitted) (quoting *Ex parte Grossman*, 267 U.S. 87, 108-109 (1925)).

*Rahimi* discussed at length how the Founding-era's surety and going armed laws disarmed individuals based on their demonstrated risk of harm to the physical safety of others. 144 S. Ct. at 1899-1902. This echoes the emphasis on disarming the physically threatening or violent that appeared in, among others, *Torres-Rosario*, 658 F.3d at 113, *Ocean State Tactical*, 95 F.4th at 47-48, and *Langston*, 110 F.4th at 420. But another kind of threat posed by those who

committed crimes was to the body politic:

> In late seventeenth-century England, legislatures had the authority to disarm classes of people who, in their view, could not be relied upon to obey the rule of law. *See Bruen*, 597 U.S. at 20 (relying on "English history dating from the late 1600s" to interpret the Second Amendment). In 1689, for example, the English government passed a law disarming Catholics who refused to make declarations renouncing their faith. 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688). This "Act for the better secureing the Government by disarming Papists and reputed Papists" provided that a Catholic individual could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defence of his House or person)." *Id.*; *see also Jackson*, 69 F.4th at 502. Enacted shortly after the Glorious Revolution of 1688—when Protestant King William and Queen Mary succeeded Catholic King James II—this statute reflected the new government's perception that Catholics who refused to renounce their faith (and allegiance to the Pope) could not be trusted to obey English law. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *Jackson*, 69 F.4th at 502. This prohibition was not based on a theory that all Catholics were, in fact, dangerous; rather, the categorical disarmament was based on concerns with a group's propensity to disobey the sovereign and the risk that presented to the social order. *Range*, 69 F.4th at 121-22 (Krause, J., dissenting); *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting) (relying on sources concluding that "[the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy'" and therefore posed a threat).

Such untrustworthiness, not demonstrated physical danger, as a reason for categorical disarmament appears elsewhere in English history. For instance, "[f]ollowing the tumult of the

English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican)

Protestants," even though such nonconformists included pacifist denominations like the Quakers.

*See Range*, 69 F.4th at 120-21 (Krause, J., dissenting) (collecting sources). Such groups "often

refused to take mandatory oaths acknowledging the King's sovereign authority over matters of

religion" and, as a result, "Anglicans accused nonconformists of believing their faith exempted

them from obedience to the law." *Id.* Their commitment to non-violence did not spare their guns.

*See Jackson*, 69 F.4th at 504 ("Not all persons disarmed under historical precedents . . . were

violent or dangerous persons" and yet they were disarmed nonetheless).

Finally, the 1689 English Bill of Rights – the Second Amendment's predecessor, *see*

*Heller*, 554 U.S. at 608 – "enshrined basic civil liberties" but also Parliament's right to limit

them. *See Bruen*, 597 U.S. at 44-45 (cleaned up); *Heller*, 554 U.S. at 593; *Atkinson*, 70 F.4th at

1031 (Wood, J., dissenting). It specified that "*Protestants* may have Arms for their Defence

suitable to their Conditions *and as allowed by Law*." 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes*

*of the Realm* 143 (1688) (emphases added); *see also Jackson*, 69 F.4th at 502; *Atkinson*, 70 F.4th

at 1031 (Wood, J., dissenting). "Englishmen had never before claimed . . . the right of the

individual to arms." *Bruen*, 597 U.S. at 44- 45 (cleaned up). And yet when they first formally

claimed that right, the English ensured that Parliament retained the power to arm one class of the

population and to disarm another based on concerns that the latter class, as a whole, would not

abide by the law. *See Atkinson*, 70 F.4th at 1031 (Wood, J., dissenting).

Moving from England to the American colonies, legislatures continued to disarm classes

of people "whom the authorities believed could not be trusted to obey the law." *See Range*, 69

F.4th at 122 (Krause, J., dissenting); *see also id.* at 122-24 & nn.50-70 (collecting sources).

Examples include the Virginia Company's 1624 disarmament of Richard Barnes, who

disrespected authorities through "opprobrious" and "base and detracting speeches concerning the Governor," *id.* at 122; Massachusetts' disarmament in the 1630s of supporters of an outspoken preacher "not because those supporters had demonstrated a propensity for violence," but because "authorities concluded their conduct evinced a willingness to disobey the law," *id.* at 123; in the 1640s of "nonconformist Protestants . . . due to their rejection of the King's sovereign power over religion," *id.*; and the colonies' disarmament (in 1696 and during the Seven Years' War of 1756-1763) of Catholics and Moravians, "a group of nonconformist Protestants from modern-day Germany," *id.* at 123-24.[8]

Decisions to disarm these groups were "not in response to violence"; indeed, Moravians "were—as they are today—committed pacifists who owned weapons for hunting instead of fighting." *Id.* at 124. The groups instead were disarmed based on their apparent "willingness to disobey the law"; seeming "[o]pposition to the king"; and "perceived unwillingness to adhere to the King's sovereign dictates." *Id.* at 123- 24 (alteration in original). Moreover, "[t]hose restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights." *Id.* at 122.

Throughout the Revolutionary War, legislatures continued to pass disarmament laws targeting those who failed to demonstrate loyalty to the emerging American government.

A 1775 Connecticut law provided that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not

---

[8] *See also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 263 (2020).

allowed to have or keep any arms." *The Public Records of the Colony of Connecticut from May, 1775 to June, 1776*, at 193 (1890) (1775 Conn. Law). In 1776, the Continental Congress recommended that colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. *4 Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six colonies enacted legislation in this vein. *See Jackson*, 69 F.4th at 503 (pointing to Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey); *see also Atkinson*, 70 F.4th at 1034 (Wood, J., dissenting) ("During the American Revolution, several states passed laws providing for the confiscation of weapons owned by persons who refused to swear an oath of allegiance to the state or to the United States.").[9]  A common feature of these laws was to require oaths of loyalty to the government and to strip anyone who failed or refused to take the oath of the right to bear arms. *See, e.g.*, 1776 Mass. Law at 479-81; 1776 R.I. Law at 566-67; 1777 N.C. Law at 229-31; 1777 Pa. law; at 111-13; 1777 Va. Law at 281-82. Many of these laws provided that failing or refusing to take the oath resulted in forfeiture of a bundle of additional political rights, including the rights to vote, serve on juries, and hold public office, *ibid.*, further reinforcing the longstanding connection between these political rights and arms-bearing.[10]  North Carolina's and Pennsylvania's colonial-era laws are

---

[9] *See also 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay*, at 479-84 (1886) ("1776 Mass. Law"); *7 Records of the Colony of Rhode Island and Providence Plantations in New England*, at 567 (1862) ("1776 R.I. Law"); *1 The Public Acts of the General Assembly of North Carolina*, at 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777); *9 The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) ("1777 Pa. Law"); *9 The Statutes at Large; Being A Collection of All the Laws of Virginia*, at 282 (1821) ("1777 Va. Law").

[10] For example, states have long denied felons the rights of members of the polity—including the right to vote, *see* U.S. Const. amend. XIV, § 2; *Richardson v. Ramirez*, 418 U.S. 24, 41-56

particularly informative because the year before they were enacted, these states adopted

constitutional provisions protecting the individual right to bear arms. *Heller*, 554 U.S. at 601; *see*

N.C. Declaration of Rights of 1776 § XVII, *in* THE COMPLETE BILL OF RIGHTS: THE

DRAFTS, DEBATES, SOURCES, AND ORIGINS 277-78 (Neil Cogan ed., 2d ed., 2014); Pa.

Declaration of Rights of 1776 § XIII, *in* THE COMPLETE BILL OF RIGHTS*, supra*, at 278.

      The history behind the Second Amendment's adoption provides additional persuasive

evidence that the Founders understood the right to keep and bear arms as compatible with

legislative authority to disarm groups who could not be trusted to follow the law. This evidence

includes the Pennsylvania Antifederalists' proposed constitutional amendment, which explicitly

recognized that criminal activity and the concomitant risk of public injury provided grounds for

disarmament. *See* 2 Bernard Schwartz, The Bill of Rights: A Documentary History 627, 665

(1971) (proposal, among other things, forbade "disarming the people, or any of them, unless for

crimes committed, or real danger of public injury from individuals") (emphasis added). *Medina*,

913 F.3d at 158-59 (explaining the proposal reflected that "criminals . . . were proper subjects of

disarmament").[11]  At the Massachusetts convention, Samuel Adams similarly proposed an

amendment providing that the Constitution shall "never [be] construed . . . to prevent the people

of the United States, who are *peaceable citizens*, from keeping their own arms." *Schwartz*, *supra*

_____

(1974); the right to hold public office, *see Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998); and the right to serve on juries, *see id*.; *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019).

[11] *Heller* described Pennsylvania's minority proposal as "highly influential," 554 U.S. at 604, likely because, as another court has explained, "it represents the view of the Anti- federalists— the folk advocating for very limited federal power, opposing the Constitution generally, but advocating for a strong Bill of Rights," *see United States v. Coombes*, 629 F. Supp. 3d 1149, 1158 (N.D. Okla. 2022) (citing *United States v. Tooley*, 717 F. Supp. 2d 580, 590 (S.D. W. Va. 2010)). *Coombes*, quoting *Tooley*, continued: "Even these advocates of broad individual and state rights viewed the right to possess and carry arms as limited— particularly from those who had committed crimes or were a danger to the public." *Id.*

at 675, 681. And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in Actual Rebellion." *Id.* at 758, 761.

To be sure, the Second Amendment, as adopted, does not explicitly reference disarmament based on commission of a crime. But the proposals' existence supports the proposition that it was "obvious" to the Founders that persons who committed crimes would properly be subject to disarmament laws. *See* Cooley, *supra*, at 29; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (writing that the Founders "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment" because this limitation "was understood").

Undoubtedly, very few of the categorical disarmaments described above would be acceptable today. The categorical disarmament of religious minorities would be rejected as abhorrent and a violation of the Equal Protection Clause – as would the categorical disarmament of Blacks and Native Americans, another practice pervasive in our country's historical tradition that is clearly contrary to its fundamental values.[12] But, considered solely for the limited purpose of the historical inquiry required by *Bruen*, these laws nonetheless "reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted." *Atkinson*, 70 F.4th at 1035 (Wood, J., dissenting); *see also Jackson*, 69 F.4th at 503;

---

[12] *See*, *e.g.*, *Williams*, 114 F.4th at 652-653 (discussing restrictions on providing arms to Native American in the interests of public safety); *Atkinson*, 70 F.4th at 1035 & n.2 (Wood, J., dissenting) (citing "laws that disarmed persons found guilty of treason and members of native tribes"); Saul Cornell, *A Well- Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 28-29 (2006) ("Laws disarming groups such as slaves, freed blacks, Indians, and those of mixed-race ancestry were common.").

*Williams*, 114 F.4th at 656 ("The key point is entire groups could be presumptively disarmed[ and t]hat principle holds true today.").

Importantly, "one can accept that the Framers denied firearms to groups they thought to be particularly dangerous (or unvirtuous, or irresponsible) without sharing their conclusion about which groups qualify as such." *See* Joseph Blocher & Catie Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders* at 12, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Blocher, J. et al. eds.) (2023).[13] Blocher and Carberry continue:

> The historical approach resolves that gap through analogical reasoning: by suggesting that our modern prohibition is based on a principle that the Framers endorsed, even if they did not apply it to [a particular group]. But to fully understand the scope of the regulatory authority the Framers thought they had, one must actually consider the gun laws that they did pass, even if we would reject those laws (perhaps for other constitutional reasons) today.

*Id.* at 12-13.

Collectively, these English and early American laws establish that regulations consistent with the Second Amendment include laws disarming those whose firearm possession is judged to be dangerous, whether that was for their membership in untrustworthy groups, or for the threat of personal violence they posed, as in the surety and going armed laws . Whether courts today would approve of these regulations is immaterial; as one court has observed, "The question posed by *Bruen* is whether there are adequate historical analogues to the law under review—not whether those historical analogues were premised on fair or wise policy (which they most certainly were not)." *United States v. Gutierrez*, No. 1:22-CR-00329, 2024 WL 4041321, at *8 (N.D. Ill. Sept. 4, 2024)

---

[13] Available at ssrn.com/abstract=3702696 or dx.doi.org/10.2139/ssrn.3702696 (last visited August 11, 2024).

C.      <u>History Also Establishes That Legislatures May Impose Regulations to Address the Dangerous Combination of Firearms and Alcohol.</u>

Marshall's likely counter to this tradition of disarming persons deemed dangerous is that he does not fall into that group, and that the Founders would not have viewed him as part of that group. But as already discussed, the Founders' beliefs about which specific classes of persons counted as dangerous cannot control here, where distinctions based on characteristics such as religious belief or race have been recognized as unconstitutional. Rather, what controls is the broader principle that legislatures have the authority to disarm those they consider dangerous or unlikely to abide by the law – in the modern context, those convicted of offenses punishable by more than a year.

At this broader level, several studies demonstrate that "there is good reason not to trust felons, even nonviolent ones, with firearms": "nonviolent offenders are at higher propensity for committing violent crimes." *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 909 (3d Cir. 2020), *abrogation on other grounds recog'd by Range*, 69 F.4th at 100. One study of approximately 200,000 nonviolent offenders released from prison found that within three years, approximately one in five (19.9%) were rearrested for violent offenses. *See* U.S. Dep't of Justice, Bureau of Justice Statistics Profile of Nonviolent Offenders Exiting State Prisons 2, 4 (2004). A different study of approximately 400,000 offenders released from prison similarly found a substantial relationship between past conviction for a non-violent offense and future rearrest for a violent one. *See* Matthew R. Durose, et al., U.S. Dep't of Justice, Bureau of Justice Statistics, Recidivism of Prisoner Released in 30 States in 2005: Patterns from 2005 to 2010, at 9 tbl. 10 (2014) (comparing rates of rearrest for violent offense by type of prior offense and indicating that even members of the group with the lowest rearrest rate – drug offenders – were rearrested 24.8% of the time).

Statistical analysis linked to firearm purchases has also found a roughly fivefold increase in the risk of future violence among individuals with prior convictions for non-violent misdemeanors. Aaron B. Shev et al., Importance of Categories of Crime for Predicting Future Violent Crime Among Handgun Purchasers in California, *10 Injury Epidemiology 57*, at 2 (2023) (citing Garen J. Wintemute et al., Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns, 280 Am. Med. Ass'n 2083 (1998); and Mona A. Wright & Garen J. Wintemute, Felonious or Violent Criminal Activity That Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors, 69 J. Trauma Injury, Infection, and Critical Care 948 (2010)).

And both the historical tradition and modern statistics support categorizing those who drive under the influence as dangerous. Historically, American legislatures have long enacted laws to mitigate the danger that arises when those who misuse or overconsume alcohol are entrusted with firearms. In 1655, for example, Virginia prohibited "shoot[ing] any gunns at drinkeing (marriages and ffuneralls onely excepted,)." Act XII of March 10, 1655, 1655 Va. Laws 401, 401-02. In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons   being often intoxicated with Liquor.'" *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244-46 (1894)).

During the American Revolution, at least two States enacted laws providing for the removal of arms from intoxicated soldiers. *See* An Act for Better Settling and Regulating the Militia of This Colony of New-Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions, § 3 (1746), available in *Military Obligation: The American Tradition* 25, pt. 8, New Jersey (1947) ("[I]f any Soldier shall . . . appear in Arms disguised in Liquor, it shall and

may be lawful for the Captain or Commanding Officer to disarm such Soldier   "); An Act for the

Regulation of the Militia of the Commonwealth of Pennsylvania, § XLV (1780), available in

*Military Obligation: The American Tradition* 97, pt. 11, Pennsylvania (1947) ("[I]f any non-

commissioned officer or private shall, on any occasion of parading the company to which he

belongs . . . be found drunk . . . he shall be disarmed   ").

And in the nineteenth century, certain States forbade intoxicated persons from buying or

carrying guns. *See* Kansas Gen. Stat., Crimes & Punishments, § 282 (1867) (prohibiting "any

person under the influence of intoxicating drink" from "carrying on his person a pistol   or other

deadly weapon"); 1878 Miss. Laws 175-76, § 2 (prohibiting the sale of pistols and certain knives

to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon

"when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of

Individuals, ch. 329 § 3 (providing that "[i]t shall be unlawful for any person in a state of

intoxication, to go armed with any pistol or revolver"); 1890 Okla. Sess. Laws 495, art. 47, § 4

(prohibiting officers from "carrying   arms while under the influence of intoxicating drinks");

1899 S.C. Acts 97, No. 67, § 1 (prohibiting "boisterous conduct" while "under the influence of

intoxicating liquors," including "discharg[ing] any gun" near a public road); *see also State v.

Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding Missouri statute as "a reasonable regulation of

the use of such arms"). These nineteenth-century laws confirm that regulations designed to

prevent the combination of firearms and alcohol from turning lethal are consistent with the

Second Amendment. *See, e.g.*, *Bruen*, 142 S. Ct. at 2137 (explaining that nineteenth-century

history can "confirm[]" the original meaning of the Second Amendment (quoting *Gamble v.

United States*, 589 U.S. ---, 139 S. Ct. 1960, 1975 (2019))).

D.    <u>Consistent With These Historical Principles, Section 922(g)(1) Is Constitutional as Applied to Marshall.</u>

As applied to Marshall, a recidivist DUI offender, Section 922(g)(1) fits comfortably within the longstanding Anglo-American tradition described above. As noted, that tradition includes both: (1) disarming those whose possession of firearms would be dangerous generally, whether due their violent acts or membership in a group that could not be trusted to follow the law; and (2) enacting regulations to address the acute danger that results from the combination of alcohol and firearms, specifically. As an initial matter, drunk driving is itself an unquestionably dangerous crime, as the Supreme Court has held, and several individual Justices have amplified in separate writings. *See, e.g.*, *Begay v. United States*, 553 U.S. 137, 141 (2008) ("Drunk driving is an extremely dangerous crime."), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015); *Holloway v. Att'y Gen. United States*, 948 F.3d 164, 174 (3d Cir. 2020) ("[A]ll branches of the federal government agree that DUIs are dangerous . . . ."); *Mitchell v. Wisconsin*, 588 U.S. 840, 862 (2019) (Sotomayor, J., dissenting) ("[D]runk driving poses significant dangers that . . . States must be able to curb."); *Virginia v. Harris*, 558 U.S. 978 (2009) (Mem.) (Roberts, C.J., dissenting from denial of writ of certiorari) ("There is no question that drunk driving is a serious and potentially deadly crime . . . . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases.").[14]

In his Complaint, Marshall takes pains to describe his criminal history as lacking "violent

---

[14] Data bears out these courts' observations. In 2004, when Marshall committed his second DUI offense, 16,649 people died in alcohol-related motor vehicle crashes in the United States, resulting in an average of one such death every 31 minutes. *Traffic Safety Facts: 2004*, Nat'l Highway Traffic Safety Ass'n, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/809919. This represents a slight increase from the numbers in 1997, when there were 16,189 fatalities in alcohol related crashes, or an average of one such death every 32 minutes. *Traffic Safety Facts 1997*, Nat'l Highway Traffic Safety Ass'n, https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/808806.

behavior" and his conviction as "non-violent," because the state did not need to prove an "element of violence" to convict. DN 1, ¶¶ 34-35, 45. However, as seen in the survey above, what appears repeatedly throughout the history of firearms regulation is a concern not just about violence per se, but also about dangerousness – that is, a recognition that legislatures could bar a class of persons from the possession of arms not only because they had committed violent acts, but because they had showed an unwillingness to obey the law and posed a threat of danger.

Moreover, the First Circuit has not required proof of an element of violence when assessing whether a conviction is dangerous enough to justify disarming the offender. For instance, in finding that appellant's convictions for distribution and possession with intent to distribute Class A controlled substances were serious enough to merit disarming him, the *Torres-Rosario* court noted that "drug dealing is notoriously linked to violence." 658 F.3d at 113; *see also Langston*, 110 F.4th at 420 (not clear or obvious that appellant's prior conviction for heroin trafficking counted as a non-violent felony); *United States v. Arnott*, 758 F.3d 40, 44–45 (1st Cir. 2014) ("The connection between drugs and violence is, of course, legendary."). But neither distribution nor possession with intent to distribute requires the government to prove an element of violence. *See also Williams*, 113 F.4th 637 at 663 (a person convicted of a crime is "dangerous" if he has committed "a crime that inherently poses a significant threat of danger").

Drunk driving is no different. The fact that the conviction does not require proof of violence does not mitigate the threat of danger it poses to the driver, anyone in their car, and anyone else on the roads. *United States v. Tristan-Madrigal*, 601 F.3d 629, 634 (6th Cir. 2010) ("There is no dispute that the act of drunk-driving is, in fact, dangerous and that every time [defendant] drove while under the influence of alcohol he was putting himself and others at risk.").

Nor did Marshall stop driving drunk after his first DUI conviction. Rather, his second conviction several years later demonstrates continued disregard for both public safety and the law.[15] That pattern of conduct easily supports the legislative determination that Marshall's possession of a firearm would be dangerous to public safety.

Further, beyond the risk that drunk driving itself creates, convictions for the offense correlate to an increased risk of violence and death in the context of firearm possession. Common sense dictates that a person who repeatedly drives drunk cannot be trusted to safely handle another piece of potentially lethal machinery – namely, a firearm – and empirical evidence confirms this conclusion. A systematic review and meta-analysis found that more than one-third of firearm homicide perpetrators and more than one-quarter of firearm suicide victims were acutely intoxicated at the time of the homicide or suicide. Charles C. Branas, *Alcohol Use & Firearm Violence*, 38 EPIDEMIOLOGIC REVS. 32, 36-37 (2016). Relatedly, DUI offenders are significantly more likely than average to commit a violent crime in the future, even controlling for other criminal history. A longitudinal study of California handgun purchasers found that purchasers with at least one prior DUI conviction and no other criminal history were more than twice as likely to be arrested for a violent crime within twelve years after the handgun purchase, compared to purchasers with no criminal record at all. Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving Under the Influence with Risk of Subsequent Arrest for Violent Crimes Among Handgun Purchasers*, 180 J. OF AM. MED. ASS'N: INTERNAL MED. 37, 38 (2019); *cf. Reichenbach*, 2023 WL 5916467, at *8 (relying in part on the "well

---

[15] Multiple DUI convictions are particularly indicative of a pattern of behavior, given the infrequency with which the crime is detected in the first instance. *See, e.g.*, *Perez v. Wolf*, 445 F. Supp. 3d 275, 282 (N.D. Cal. 2020) (citing evidence that "less than 1% of DUI offenses are even detected").

understood" and "dangerous" "connection between drugs, firearms, and deadly violence" to conclude that "lawmakers have made a reasoned decision that drug traffickers are dangerous and disruptive to society" and thus may be disarmed to protect public safety).

Although there is no founding-era law disarming DUI offenders specifically, none is required for the government to prevail. As already discussed, both *Bruen* and *Rahimi* hold that in analogizing between modern and historical firearm regulations, only "a well-established and representative historical *analogue*" is required, "not a historical *twin*." 142 S. Ct. at 2133; *see also id.* at 1901 (section 922(g)(8) is "by no means identical to the founding era" surety and going armed legal regimes, "but it does not need to be"). Further, as the Supreme Court also explained in *Bruen*, "a more nuanced approach" to analogical reasoning is required in "cases implicating . . . dramatic technological changes" and, by extension, "circumstances beyond those the Founders specifically anticipated." *Id.* at 2132; *cf. Heller*, 554 U.S. at 582 (dismissing as "bordering on the frivolous" the argument that the Second Amendment protects "only those arms in existence in the 18th century"); *Ocean State Tactical*, 95 F.4th at 44 (emphasizing the technological change in firearms since the founding era).

While alcohol misuse is hardly new, the motor vehicle was invented only the late nineteenth century. *Gasoline Explained*, U.S. Energy Info. Admin. (last updated Nov. 17, 2022), https://www.eia.gov/energyexplained/gasoline/history-of-gasoline.php. To state the obvious, the Founders could not regulate something that did not yet exist, rendering the absence of a Founding-era law disarming DUI offenders immaterial. And while the Founders clearly used means of transportation, the technological differences between horses and horse-drawn wheeled vehicles of the colonial era, and modern motor vehicles and road systems are stark enough that automobiles "implicate unprecedented societal concerns" that the Founders could not have

anticipated. *Ocean State Tactical*, 95 F.4th at 44. And as the First Circuit recognized in *Ocean State Tactical*, the fact that modern firearms are "substantially more lethal" than those used at the Founding means that this form of technological change, too, has created a societal problem unknown to the Founders. *Id.*

CONCLUSION

In sum, the Second Amendment codified a preexisting right that has always allowed legislatures to disarm those whose possession of firearms has been deemed dangerous, whether due to their own violent actions, or their membership in groups considered a threat to the body politic by their unwillingness to abide by the law. By virtue of his multiple DUI convictions, Marshall "fits neatly" within that category. *Rahimi*, 144 S. Ct. at 1901. Nothing in Supreme Court or First Circuit precedent suggests otherwise. Accordingly, the government asks this Court to dismiss Marshall's complaint for failure to state a claim.

Respectfully submitted,

JANE E. YOUNG
United States Attorney

Dated: September 23, 2024          By: /s/*Anna Dronzek*
                                                Anna Dronzek
                                                Assistant United States Attorney
                                                Colorado Bar No. 43912
                                                United States Attorney's Office
                                                53 Pleasant Street, 4th Floor
                                                Concord, NH  03301
                                                (603) 225-1552
                                                Anna.Dronzek@usdoj.gov

35